IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| WESTFIELD INSURANCE COMPANY, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | C.A. No. 08-56-JJF |
| | : | |
| CHIP SLAUGHTER AUTO WHOLESALE, | : | |
| INC.; PAUL SLAUGHTER; LEE F. | : | |
| SLAUGHTER, JR.; DANIEL FEELEY, | : | |
| by his Guardian Ad Litem, | : | |
| KELLY BLAIR; LAUREN DIEHL; | : | |
| and COLIN SANDLER, | : | |
| | : | |
| Defendants, | : | |
| Third-Party | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| PFISTER INSURANCE, INC., | : | |
| | : | |
| Third-Party | : | |
| Defendant. | : | |

James S. Yoder, Esquire and Stephen J. Milewski, Esquire of WHITE AND WILLIAMS, LLP, Wilmington, Delaware.

Attorneys for Plaintiff.

Benjamin A. Schwartz, Esquire of SCHWARTZ & SCHWARTZ, P.A., Dover, Delaware.

Attorney for Defendants/Third-Party Plaintiffs Paul Slaughter; Lee F. Slaughter, Jr.; and Chip Slaughter Auto Wholesale, Inc.,

Nicholas H. Rodriguez, Esquire of SCHMITTINGER & RODRIGUEZ, P.A., Dover, Delaware.

Attorney for Defendant/Third-Party Plaintiff Lauren R. Diehl.

Jeffrey J. Clark, Esquire of SCHMITTINGER & RODRIGUEZ, P.A., Dover, Delaware.

Attorney for Defendant/Third-Party Plaintiff Daniel Feeley.

Stephen P. Casarino, Esquire of CASARINO CHRISTMAN SHALK RANSON &
DOSS, P.A., Wilmington, Delaware.

Attorney for Third-Party Defendant, Pfister Insurance, Inc.

**MEMORANDUM OPINION**

June 16, 2010
Wilmington, Delaware.

Farnan, District Judge.

Pending before the Court are three Motions for Summary Judgment: (1) a Motion For Summary Judgment (D.I. 35) filed by Plaintiff, Westfield Insurance Company; (2) a Motion For Summary Judgment (D.I. 38) filed by Defendants, Chip Slaughter Auto Wholesale, Inc.; Paul Slaughter; Lee F. Slaughter, Jr.; Daniel Feeley, by his Guardian Ad Litem, Kelly Blair; Lauren Diehl and Colin Sandler; and (3) a Motion For Summary Judgment (D.I. 40) filed by Third-Party Defendant Pfister Insurance, Inc.  For the reasons discussed, the Court will grant summary judgment in favor of Westfield Insurance Company and Pfister Insurance Company.

## I.   Background

This action involves insurance coverage in connection with a motor vehicle collision occurring on or about December 27, 2005. Defendant Paul Slaughter was driving the vehicle with Defendants Daniel Feeley, Lauren Diehl and Colin Sandler as passengers.  The vehicle, a 1998 Oldsmobile Cutlass (the "vehicle"), was owned and insured by Defendant Paul Slaughter's father, Defendant Lee "Chip" Slaughter, through a policy (the "Progressive policy") issued by Progressive Insurance Company ("Progressive") in Lee Slaughter's name.  Defendant Lee Slaughter is the owner and operator of a used car lot and garage shop in Kent County, Delaware called Chip Slaughter Auto Wholesale, Inc. t/a Chip Slaughter Auto Sales ("Chip Slaughter Auto").  Plaintiff Westfield Insurance Company ("Westfield") issued a Commercial

Insurance Coverage Policy (the "Westfield policy") to Chip
Slaughter Auto containing both Commercial General Liability
Coverage ("CGL") and Auto coverage.   Third-Party Defendant
Pfister Insurance, Inc. ("Pfister") is the insurance agency
through which both the Westfield and Progressive policies were
obtained.

At the time of the accident, it is undisputed that Paul
Slaughter was sixteen years old with a learner's permit, under
the influence of drugs and/or alcohol, and driving beyond his
curfew time.   Paul Slaughter lost control of his vehicle,
striking a utility pole and a brick wall.   The vehicle
overturned, and the passengers were injured.

Daniel Feeley and Lauren Diehl, through separate guardians
ad litem, brought personal injury actions in the Superior Court
of the State of Delaware against Paul Slaughter, asserting claims
of negligence, and against his father Lee Slaughter, asserting
claims of negligence, negligent entrustment, and vicarious
liability for the negligence of his son.   Notably, the Feeley
Complaint did not name Chip Slaughter Auto as a defendant, but
the Diehl Complaint did.   The Diehl Complaint alleged that as an
owner of the vehicle, Chip Slaughter Auto was jointly and
severally liable with Paul and Lee Slaughter.[1]   These actions

---

[1] Lee Slaughter testified in his deposition in this action
that the vehicle was titled in his name only.   (D.I. 49, at
B256.)

2

were consolidated in Superior Court (the "Feeley/Diehl action"). Colin Sandler has not asserted any claims against Paul Slaughter, Lee Slaughter, or Chip Slaughter Auto.

On January 16, 2007, Pfister sent an Automobile Loss Notice to Westfield on behalf of Chip Slaughter Auto.  (D.I. 42, at A-314.)  By letter dated March 1, 2006, listing Chip Slaughter and Chip Slaughter Auto as the insureds, Westfield denied coverage under the Westfield policy for any damages related to the collision.  (Id. at A-315.)  Progressive defended Paul and Lee Slaughter in the Feeley/Diehl action.  In October 2008, plaintiffs in the Feeley/Diehl action entered into a Stipulated Judgment with Paul Slaughter, Lee Slaughter and Chip Slaughter Auto.  Judgment was entered against Paul Slaughter, Lee Slaughter and Chip Slaughter Auto, jointly and severally, and in favor of Daniel Feeley for $300,000 and Lauren Diehl for $200,000.  (D.I. 37, at West 0012- 0015.)  Progressive paid $100,000 each to Daniel Feeley and Lauren Diehl, the maximum amounts under the Progressive policy.  The balance of the judgments against Paul Slaughter, Lee Slaughter, and Chip Slaughter Auto Sales remains unsatisfied.

Westfield filed this declaratory judgment action on January 1, 2008 against Chip Slaughter Auto, Lee Slaughter, Paul Slaughter, Daniel Feeley, and Lauren Diehl (collectively, "Defendants").  (D.I. 1.)  Westfield seeks an order that it has

3

no obligation under the Westfield policy to defend or indemnify Defendants Chip Slaughter Auto, Paul Slaughter or Lee Slaughter in connection with the underlying Feeley/Diehl action.  Westfield also seeks an order that Defendants Feeley and Diehl are not entitled to $300,000 in coverage under the Westfield policy. (Id.)

All Defendants have filed counterclaims against Westfield (1) seeking a declaration that the Westfield policy applied to this accident and that Westfield is obligated to provide the $300,000 in coverage to Defendants Daniel Feeley and Lauren Diehl on behalf of Defendants Chip Slaughter Auto, Paul Slaughter and Lee Slaughter, or (2) in the alternative, seeking reformation of the Westfield policy to provide the coverage.  (D.I. 3.)  All Defendants have also filed a Third-Party Complaint against Pfister asserting breach of contract, negligence, equitable fraud, and negligent misrepresentation.  (Id.)  In the Third-Party Complaint, Defendants/Third-Party Plaintiffs allege that Pfister was the agent of Westfield, and that Pfister's agent, Mel Warren ("Warren"), expressly represented to Lee Slaughter that the vehicle driven by Paul Slaughter was covered under the Westfield policy and that Westfield would provide the additional coverage beyond the Progressive policy needed to satisfy the Feeley/Diehl judgment.  (Id.)

4

## II.   The Parties' Contentions

### A.   Plaintiff's Claim and Defendants' Counterclaim

By its Motion, Westfield contends that the Westfield policy does not apply to the collision in this case.  Specifically, Westfield contends that (1) the CGL coverage contains unambiguous exclusions for claims arising out of motor vehicle operations, and (2) the Auto portion of the Westfield policy does not provide coverage for Defendants Paul Slaughter or Lee Slaughter.  (D.I. 36.)  Specifically, under the plain language of the Westfield policy, Westfield contends that Defendant Paul Slaughter is not entitled to coverage because he is not a named insured on the policy.  Westfield contends that Defendant Lee Slaughter is not entitled to coverage because the accident did not arise out of the course or scope of the Chip Slaughter Auto business, and there is no "broadened coverage" under the facts of this case.

In response and by its Motion, Defendants contend that they are not claiming coverage under the CGL portion of the Westfield Policy, but rather under the Auto portion of the policy.  In this regard, Defendants contend that they are entitled to summary judgment because the policy language in the Auto portion includes a broad definition of the term "garage operations," and a broad designation for covered "autos," under which Chip Slaughter Auto is covered.  Further, Defendants contend that Defendant Lee Slaughter individually is covered because he is listed as a named

5

insured under the policy, and that Defendant Paul Slaughter was a permissive user of the vehicle.   In the alternative, Defendants contend that genuine issues of material fact remain on their reformation claim against Westfield.

### B.   Defendants/Third Party Plaintiff's Claim Against Third Party Defendant Pfister

Pfister contends that it is entitled to summary judgment with regard to each claim asserted against it by Defendants/Third-Party Plaintiffs.   Pfister contends that Defendant Lee Slaughter never gave any instructions to Warren, the agent, regarding the coverage he desired.   Absent such instructions, Pfister contends that its agent did not breach the standard of care in providing the desired coverage to Lee Slaughter, and there can be no liability under either a breach of contract or tort theory.   Pfister also contends that it cannot be liable for negligent misrepresentation or equitable fraud because there is no evidence of a false representation, justifiable reliance, or pecuniary loss, and in any event, Pfister owed no duty to Defendant Lee Slaughter to explain coverage once the actual Westfield policy was delivered to him.   Further, Pfister contends that it cannot be liable for any alleged representation that the Westfield policy would provide the desired coverage because such an interpretation of the policy is absurd when compared with the policy language.   In the alternative, Pfister contends that an insurance agent is a professional within the

6

meaning of Delaware law, and therefore, an expert is needed to
establish malpractice.  Lastly, Pfister contends that
Defendants/Third-Party Plaintiffs lack standing to bring a claim
under the Deceptive Trade Practices Act, ("DTPA"), 6 Del. C. §
2532(a)(5), because Defendants/Third-Party Plaintiffs are
consumers and not a competing business.

In response to Pfister's arguments, Defendants/Third-Party
Plaintiffs have withdrawn their claim under the DTPA.  With
respect to their remaining claims, Defendants/Third-Party
Plaintiffs argue that coverage is available as a matter of law
under the Westfield policy, making a determination on Pfister's
Motion unnecessary.  In the alternative, Defendants/Third-Party
Plaintiffs contend that genuine issues of material fact preclude
summary judgment in favor of Pfister at this time.
Defendants/Third-Party Plaintiffs also contend that although the
Delaware Supreme Court has not ruled on the issue of whether
expert testimony is required to establish a claim of breach of
contract or negligence by an insurance agent, the Third Circuit
and other Delaware state courts have expressly addressed the
issue and concluded that no such expert testimony is required.

**III. Legal Standard**

Pursuant to Rule 56(c) of the Federal Rules of Civil
Procedure, "if the pleadings, the discovery and disclosure
materials on file, and any affidavits show that there is no

7

genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law," then the court should grant summary judgment. Fed. R. Civ. P. 56(c). When considering whether a genuine issue of material fact exists, the court must view the evidence in the light most favorable to the non-movant, and resolve all reasonable inferences in the non-movant's favor. Wishkin v. Potter, 476 F.3d 180, 184 (3d Cir. 2007). However, a court should not make credibility determinations or weigh the evidence. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person would conclude that the position of the person with the burden of proof on the disputed issue is correct." Horowitz v. Fed. Kemper Life Assurance Co., 57 F.3d 300, 302 n.1 (3d Cir. 1995)(internal citations omitted).

The movant bears the burden of proving the absence of a genuine issue of material fact. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 n.10 (1986). Once the movant offers such proof, the non-movant "must come forward with 'specific facts showing [a] genuine issue for trial.'" Id. (quoting Fed. R. Civ. P. 56(e)). The mere existence of some evidence in support of the non-movant will not be sufficient to survive a motion for summary judgment; there must be enough evidence to enable a jury to reasonably find for the non-movant

8

on that issue.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  Thus, in ruling on a summary judgment motion, the court must perform the "threshold inquiry of determining whether . . . there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  Id. at 250.

## IV.  Discussion

### A.  Whether the Westfield Policy Provides Coverage To Defendants Chip Slaughter Auto, Lee Slaughter And Paul Slaughter

Under Delaware law, a court's interpretation of an insurance contract is a determination of law.  Hudson v. State, 569 A.2d 1168, 1170 (Del. 1990).  Unless otherwise provided by law, the rights and responsibilities of the parties to an insurance contract are dictated by the terms of the contract.  See Goodman v. Cont'l Cas. Co., 347 A.2d 662, 664 (Del. Super. 1975).  Accordingly, the first step in interpreting an insurance contract necessarily focuses on the language of the policy itself.

Insurance policies must be interpreted in the context of examining "all relevant portions of the policy, rather than reading a single passage in isolation."  Cheseroni v. Nationwide Mut. Ins. Co., 402 A.2d 1215, 1217 (Del. Super. 1979).  Further, an insurance policy "must be interpreted in a common sense manner, giving effect to all provisions so that a reasonable policyholder can understand the scope and limitations of the

9

coverage." <u>Penn. Mut. Life Ins. Co. v. Oglesby</u>, 695 A.2d 1146, 1149 (Del. 1997).  If the language of an insurance policy is clear and unambiguous, the parties will be bound by its plain meaning.  <u>Hallowell v. State Farm Mut. Auto. Ins. Co.</u>, 443 A.2d 925, 926 (Del. 1982).  Delaware courts will not "destroy or twist the words [of a policy] under the guise of construing them," because "creating an ambiguity where none exists could, in effect, create a new contract with rights, liabilities and duties to which the parties had not assented." <u>Id.</u> (citations omitted).

The language of an insurance policy is not ambiguous merely because the parties raise conflicting interpretations.  <u>E.I. du Pont de Nemours & Co. v. Allstate Ins. Co.</u>, 686 A.2d 152, 156 (Del. 1996).  Rather, an ambiguity exists only when there are two or more equally reasonable interpretations of the policy. <u>Hallowell</u>, 443 A.2d at 926.  As a general matter, courts construe ambiguous language in an insurance policy against the drafter of the policy.  <u>Hallowell</u>, 443 A.2d at 926.

In pertinent part, the Auto portion of the Westfield Policy provides:

> We (Westfield) will pay all sums an <u>'insured'</u> legally must pay as damages because of 'bodily injury' or 'property damage' to which the insurance applies, caused by an 'accident' and resulting from <u>'garage operations'</u> involving the ownership, maintenance or use of <u>covered 'autos.'</u>
>
> . . . We have the right and duty to defend any 'insured' against a 'suit' asking for such damages. . . However we have no duty to defend any 'insured' against

10

a suit seeking damages for 'bodily injury' or 'property
damage' to which this insurance does not apply. . .

(D.I. 49, at B137 (emphasis added.)  The key words concerning the
dispute in this case are "insured," "garage operations," and
"covered autos."  It is axiomatic that an insurance company may
limit coverage to the named insured, and such a coverage
limitation is indeed, standard practice in the insurance
industry.  Adams-Baez ex rel Adams v. General Acc. Co., C.A. No.
04C-02-219WCC, 2005 WL 2436220, at *2 (Del. Super. Sept. 30,
2005).  Thus, as a threshold matter, the Court must first
determine who the named insured is under the Westfield Policy.

The policy unambiguously provides that Chip Slaughter Auto
is the named insured under the policy.  The preamble to the
Garage Coverage Form states that "[t]hroughout this policy, the
words 'you' and 'your' refer to the Named Insured shown in the
Declarations."  (D.I. 49, at B135.)  On the Declarations Pages,
Chip Slaughter Auto is listed in the boxes providing "Named
Insured And Mailing Address."  (Id. at B133-34.)

Having thus concluded that Chip Slaughter Auto is the named
insured on the policy, the Court next considers who the
"insureds" are for whom coverage is provided under the policy
language.  In relevant part, the section of the Westfield Policy
captioned "Who is An Insured" states:

11

a.   The following are 'insureds' for covered 'autos:'

(1) You for any covered 'auto.'

(2) Anyone else <u>while using</u> with your permission, a covered 'auto' you own, hire or borrow <u>except</u>:

> (a) <u>The owner</u> or anyone else from whom you borrow a covered 'auto.'  This exception does not apply if the covered 'auto' is a 'trailer' connected to a covered 'auto' you own.

> (b)  Your 'employee' if the covered 'auto' is owned by that 'employee' or a member of his or her household.

(<u>Id.</u> at B137 (emphasis added).)  Again, the term "you" refers to the named insured- Chip Slaughter Auto.  Accordingly, Chip Slaughter Auto is an "insured" for any "covered 'auto'."  Even assuming that the vehicle was a "covered 'auto'" within the policy's language, Lee Slaughter was not the person using the vehicle at the time of the accident, and therefore, is not an "insured" under the above-cited language.  Further, Lee Slaughter testified that the vehicle was titled in his name, <u>supra</u> n.1, and since Defendants have produced no evidence to the contrary, there is no material factual dispute that Lee Slaughter was the owner of the vehicle.  Under the policy language, therefore, he is also excepted from coverage as the vehicle's owner.

Defendants, however, contend that Lee Slaughter is an "insured" because an endorsement in the Declarations Pages

12

provides that the policy has Drive Other Car Coverage.  (Id. at

B134).  In turn, the Drive Other Car Coverage adds the following

to the policy's general "Who Is An Insured" section:

> 2.  Any individual named in the Schedule and his or her
> spouse, while a resident of the same household, are
> 'insureds' while using any covered 'auto' described in
> Paragraph B.1. of this endorsement.

(Id. at B165 (emphasis added).)  Chip Slaughter (i.e., Lee

Slaughter) is the only individual listed in the endorsement's

Schedule, but again, he was not the individual using the vehicle

at the time of the accident.  In any event, the vehicle is not a

"covered 'auto'" as described in Paragraph B.1. of the

endorsement:

> 1.  Any 'auto' you don't own, hire or borrow is a covered
> 'auto' for Liability Coverage while being used by any
> individual named in the Schedule or by his or her spouse
> while a resident of the same household except:
>
> > a.  Any 'auto' owned by that individual or by any
> > member of his or her household.

(Id. (emphasis added).)  Again, it is undisputed that Lee

Slaughter was the owner of the vehicle.  Although Defendants are

correct that in some instances Lee Slaughter is an "insured"

under the Drive Other Car Coverage, he was not in this instance

because (1) he was not operating the vehicle, and (2) because he

was the vehicle's owner, thereby excluding the vehicle as a

"covered 'auto'" as defined by Paragraph B.1. of the endorsement.

Therefore, Lee Slaughter was not an "insured" under any of the

policy's unambiguous language.

The only basis on which Defendants contend that Paul Slaughter was an "insured" under the policy is that he was the permissive user of the vehicle's owner, Lee Slaughter. Since it is established that Lee Slaughter was not an "insured" under the policy's Auto coverage in this factual scenario, however, Defendants' contention that Paul Slaughter was a permissive user also fails.[2]

Because Chip Slaughter Auto is an "insured" under the policy, whether the policy's Auto coverage covers Chip Slaughter Auto's liability for the accident turns on whether the accident "result[ed] from 'garage operations' involving the ownership, maintenance or use of covered 'autos.'" The Court concludes that the vehicle was a "covered 'auto'" under the policy's unambiguous language. Section I- Covered Autos in the Garage Coverage Form provides that "Item Two of the Declarations are covered 'autos' for each of your [Chip Slaughter Auto's] coverages." (Id. at B135.) Item Two of the Declarations lists

---

[2] Alternatively, neither was Paul Slaughter a permissive user of Chip Slaughter Auto under the policy language. It is undisputed that Chip Slaughter Auto, the "insured" under the policy, did not own the vehicle. Supra n.1. Although Lee Slaughter testified that Paul Slaughter would occasionally use the vehicle to run errands for Chip Slaughter Auto (e.g., D.I. 49, at B241), the parties do not dispute that on the night of the collision, Paul Slaughter was operating the vehicle solely for his personal use (id. at B243). Therefore, because Chip Slaughter Auto did not own, hire, or borrow the vehicle, Paul Slaughter cold not have been its permissive user, and Paul Slaughter was not an "insured."

"21" as the "Covered Auto Symbol."  (Id. at B133.)  According to

the Description Of Covered Auto Designation Symbols in the Garage

Coverage Form, Symbol 21 means "Any 'Auto'."  (Id. at B135.)

Thus, the vehicle is encompassed within this definition and is a

"covered 'auto'."

The term "garage operations" is explicitly defined in the

policy as follows:

> 'Garage operations' means the ownership, maintenance or use
> of locations for garage business and that portion of the
> roads or other accesses that adjoin these locations.
> 'Garage operations' includes the ownership, maintenance or
> use of the 'autos' indicated in Section I of this Coverage
> Form as covered 'autos.' 'Garage operations' also include
> all operations necessary or incidental to a garage business.

(Id. at B150.)  Relying on the second sentence of this

definition, Defendants contend that the accident involved the use

of the vehicle, a covered auto, and that it was therefore within

the definition of "garage operations."  The Court concludes that

the policy is unambiguous and that the accident did not result

from "garage operations" covered under the policy.  As Defendants

argue, the second sentence appears to envision coverage for any

"garage operations" that generally deal with the ownership,

maintenance and use of covered autos, not merely those operations

circumscribed to garage business uses.  This definition cannot be

read in isolation, however.  If the definition of an "insured" is

to retain any meaning, the policy necessarily contemplates that

"garage operations" includes an insured's use of a covered auto,

15

not anyone's use of a covered auto.

This interpretation is actually supported by authority cited by Defendants, <u>Spangle v. Farmers Ins. Exch.</u>, 82 Cal. Rptr. 3d 763 (Cal. Ct. App. 2008). The issue in <u>Spangle</u> also related to liability under a garage operators' insurance policy. <u>See</u> <u>Spangle</u>, 82 Cal. Rptr. 3d at 765-66. The relevant provision in that policy was nearly identical to the provision at issue in this action: "We will pay all sums an 'insured' legally must pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies, caused by an 'accident' and resulting from 'garage operations' involving the ownership, maintenance or use of covered 'autos.'" <u>Id.</u> at 769. Similarly, "covered 'auto'" was defined as "any 'auto'." <u>Id.</u> The Court of Appeal of California held that "[t]he policy's basic coverage provision thus encompasses liability for bodily injury or property damage incurred by an insured that is caused by an accident and that results from an insured's use of any auto." <u>Id.</u> at 770.

As established above, and in contrast to <u>Spangle</u>, Paul Slaughter was not an insured under the Westfield policy as a matter of law. Moreover, there is no factual dispute that Paul Slaughter was the individual operating the vehicle on the night of the accident. Accordingly, non-insured Paul Slaughter's "use" of the "covered auto"- the vehicle- was not a "garage operation"

covered by the policy.   That Chip Slaughter Auto subsequently
stipulated to liability for damages arising from Paul Slaughter's
use of the vehicle does not change this determination, and to so
allow would eviscerate the meaning of the term "insured" under
the policy.

In sum, the Court concludes that the policy is unambiguous
and that the policy does not provide coverage to Defendants Chip
Slaughter Auto, Lee Slaughter, or Paul Slaughter for liability
from the accident.   Therefore, summary judgment will be granted
in favor of Westfield as to Count I of the Complaint, and against
Defendants as Defendants' Counterclaim I.

## B.   Whether Plaintiff Is Entitled To Summary Judgment On Defendants' Counterclaim II- Reformation

Defendants alternatively contend that if there is no
coverage due them under the policy, then material factual issues
remain regarding their claim against Westfield for reformation of
the policy.   Defendants do not elaborate on what these factual
issues are.   Westfield contends that summary judgment in its
favor on Defendants' reformation claim is also appropriate
because Pfister was incapable of binding coverage, and "since
[Plaintiff] would not have accepted the risk anyway, there is
simply no proximate causation between Pfister's alleged
wrongdoing and any loss to Defendants that would justify
reformation of the Westfield policy."   (D.I. 51, at 14.)

The Court concludes that Westfield is entitled to summary

judgment on Defendants' reformation counterclaim.  It is well-established that "[w]hen the language of a contract is plain and unambiguous, the intent of the parties expressed in that language is binding." Local Union 1183 UAW Bldg. Co. v. William Holding, LLC, C.A. No. 08C-07-135 RRC, 2009 WL 1547217, at *4 (Del. Super. Ct. June 2, 2009)(citing Sun-Times Media Group, Inc. v. Black, 954 A.2d 380, 389 (Del. Ch. 2008)).  However, in instances where the document itself does not reflect the original intent of the parties, the court may exercise its equitable power to reform the document. Waggoner v. Laster, 581 A.2d 1127, 1135 (Del. 1990)(citing Douglas v. Thrasher, 489 A.2d 422, 426 (Del. 1985)). In Delaware, the standard for reformation is as follows:

> Generally, reformation is appropriate, when an agreement has been made, or a transaction has been entered into or determined upon, as intended by all parties interested, but in reducing such agreement or transaction to writing, either through the mistake common to both parties, or through the mistake of the plaintiff accompanied by the fraudulent knowledge and procurement of the defendant, the written instrument fails to express the real agreement or transaction. In such a case the instrument may be corrected so that it shall truly represent the agreement or transaction actually made or determined upon according to the real purpose and intention of the parties.

Id.

There is conflicting testimony in the record as to whether, at the time the Progressive policy was entered into, the parties understood the Westfield policy to also cover Lee Slaughter and/or Paul Slaughter's use of the vehicle.  However, for purposes of reformation of the Westfield policy, a mutual mistake

18

or Defendants' mistake accompanied by the fraudulent knowledge and procurement of Westfield, must have existed *when the Westfield policy was made*.   Defendants have not pointed to the existence of any such evidence in the record.   Having found that the Westfield policy is unambiguous, and that Defendants have not presented any evidence of mutual mistake, or mistake accompanied by fraudulent knowledge and procurement in the reduction of the Westfield policy to writing, the Court concludes that there is no genuine issue of material fact as to whether the Westfield policy conforms with the parties' original intent.   Accordingly, summary judgment will be granted in favor of Plaintiff and against Defendant as to Count II of Defendants' Counterclaim.

### C. **Whether Pfister is Entitled To Summary Judgment On Claims Brought By Defendants/Third Party Plaintiffs**

#### 1. Breach Of Contract And Negligence

The Court concludes that there are no genuine issues of material fact regarding Defendants/Third-Party Plaintiffs' breach of contract and negligence claims.   In its Third-Party Complaint, Defendants/Third-Party Plaintiffs allege that they entered a contract with Pfister "to obtain an insurance policy which would cover, inter alia, the car driven by Paul Slaughter on the day and time of the collision at issue, and would provide $300,000 of indemnity coverage and defense to both Lee Slaughter and Paul Slaughter under these circumstances," and that Pfister breached its obligation to obtain a policy providing such coverage.   (D.I.

19

3 ¶¶ 6-7.)  With regard to their negligence claim, Defendants/
Third-Party Plaintiffs allege that "Pfister had the duty to []
take reasonable care to obtain the coverage promised when selling
the Westfield policy at issue to the Slaughter Defendants, and
failed to do so," and that the failure to obtain the promised
coverage "directly and proximately caused the loss of $300,00 in
coverage available for the subject matter collision."  (Id. 3 ¶¶
11-12.)

An insurance agent is required to use reasonable care, skill
and diligence in discharging his duties, and he may be held
liable for any damage that results from his failure to do so.
Giangrant v. Richard A. Parsons Agency, Inc., 1987 WL 25495 at *2
(Del. Super. Ct. Nov. 19, 1987)(citing Ins. Co. of Am. v.
Waterhouse, 424 A.2d 675 (Del. Super. Ct. 1980)).  An agent's
liability for breach of contract for failure to provide insurance
according to his agreement turns on whether he fulfilled his duty
to use reasonable, ordinary skill and diligence of a person
engaged in the insurance business, to procure the insured's
policy.  Id. (citing 3 Couch on Insurance §§ 25:27; 25:46
(1984)).  Similarly, an agent's liability in tort for negligent
failure to procure the correct insurance turns on whether his
failure was wrongful, and whether the agent's conduct was
neglectful or unjustified.  Id. (citing Conestoga Chem. Corp. v.
F.H. Simonton, Inc., 269 A.2d 237, 239 (Del. Super. 1979)).

"Negligence is generally found where the agent/ intermediary fails to procure specific types of requested insurance, or upon evidence of the previous conduct of the agent acting to procure insurance without specific instructions of the applicant to do so." Blanchfield v. State Farm Mut. Auto. Ins. Co., C.A. No. 82C-DE-72, 1985 WL 189320, at *2 (Del. Super. Ct. Nov. 27, 1985).

The record reflects that the Westfield policy had been in effect for approximately 10-15 years before Paul Slaughter's accident. (See D.I. 49, at B188 (Lee Slaughter testifying that the Westfield policy had been in effect for "about ten years"); id. at B269 (Warren testifying that the Westfield policy application was first completed in 1990).) Defendants contend that Lee Slaughter's deposition testimony "was clear that Pfister agreed to provide a policy to provide $300,000 of extra coverage that followed the very car at issue in this collision." (D.I. 46, at 11.) Upon review of the entire deposition, the Court finds that none of Lee Slaughter's testimony explicitly or implicitly references such an agreement, or even a request by Lee Slaughter that Warren obtain such coverage. Rather, Lee Slaughter testified, inter alia, that Warren told him that the Westfield policy covered any car Lee Slaughter had contact with, that the insurance "follows the car," and that the Westfield policy provided coverage for Chip Slaughter Auto, Paul Slaughter, and his family members. (D.I. 49, at B189, 247-48, 255.) Even

21

when viewed in the light most favorable to Defendants/Third
Party-Plaintiffs, these are representations concerning the scope
of the Westfield policy's coverage made after its procurement.

More importantly, Lee Slaughter's testimony indicates that
he did not specifically request that Warren obtain coverage under
the Westfield policy for the vehicle involved in the collision,
but rather, relied on his understanding that the Westfield
policy, as it already existed, would cover Paul Slaughter and the
vehicle:

> Q: Did you talk with Mel Warren about the time your son -
> A: Yes.
> Q: - was getting a license to make sure that you had
> additional coverage?
> A: Right.
> Q: Did you talk to him about the Westfield policy also?
> A: No, because I knew that Westfield was covering
> everything.
> Q: Okay.  And that was based on what he told you Westfield
> would cover?
> A: Right.

(Id. at B192 (emphasis added).)  Accordingly, there is no genuine
issue of material fact as to whether Pfister promised to procure
coverage under the Westfield policy for Paul Slaughter, and
Pfister is entitled to summary judgment on Defendants/Third-Party
Plaintiffs' breach of contract and negligence claims.[3]

---

[3] Additionally, the record evidence suggests that Pfister is
entitled to summary judgment on the negligence claim on statute
of limitations grounds.  An insured's cause of action against an
insurance agent for negligent procurement of insurance coverage
is governed by 10 Del. C. § 8106, which provides a three year
statute of limitations.  Kaufman v. C.L. McCabe & Sons, Inc., 603
A.2d 831, 833-34 (Del. 1992).  Generally, this cause of action

2.   Negligent Misrepresentation And Equitable Fraud

The Court concludes that there are no genuine issues of material fact regarding Defendants/ Third Party Plaintiffs' negligent misrepresentation and equitable fraud claims.  A negligent misrepresentation claim under Delaware law requires the plaintiff to prove: (1) a pecuniary duty to provide accurate information; (2) the supplying of false information; (3) failure to exercise reasonable care in obtaining or communicating information; and (4) a pecuniary loss caused by justifiable reliance upon the false information.  Darnell v. Myers, No. 14859-NC, 1998 WL 294012, at *5 (Del. Ch. May 27, 1998).  An equitable fraud claim under Delaware law requires the plaintiff to prove: (1) a false representation, usually one of fact, made by the defendant; (2) an intent to induce the plaintiff to act or to refrain from acting; (3) the plaintiff's action or inaction taken in justifiable reliance upon the representation; and (4) damage to the plaintiff as a result of such reliance.  Zirn v. VLI Corp., 681 A.2d 1050, 1060-61 (Del. 1996)(citing Gaffin v. Teledyne, Inc., 611 A.2d 467, 472 (Del. 1992)).  Notably,

---

accrues at the time of delivery of the policy, not at the time when the insured suffers a loss for which it is not covered.  Id. The evidence indicates that the Westfield policy had been in effect for at least approximately 10 years before Paul Slaughter's accident, supra p. 21, and therefore, it appears this claim is barred by the statute of limitations.  As the parties have not addressed the statute of limitations issue, however, the Court does not rest its holding on this ground.

23

equitable fraud does not require that "the defendant have known or believed its statement to be false or to have made the statement in reckless disregard of the truth." Id. (citing Stephenson v. Capano Dev., Inc., 462 A.2d 1069, 1074. (Del. 1983)).

In their Third-Party Complaint, Defendants/Third-Party Plaintiffs allege that "Pfister made a false representation to the Slaughter Third-Party Plaintiffs that the Westfield policy would provide coverage for Paul and Lee Slaughter while Paul Slaughter was using the car involved in the collision," that the statement was made "with the intent to induce the Slaughter Third-Party Plaintiffs to purchase the Westfield policy," and that the Defendants/ Third-Party Plaintiffs reasonably relied on the statement and were in fact induced to buy the Westfield policy. (D.I. 3 ¶¶ 15-17.)  In his deposition, Mel Warren testified "I felt I made it very clear to Chip that the Progressive policy would then be the one that would be covering this vehicle, and the Westfield policy would not be covering the vehicle." (D.I. 49, at B274.)  Lee Slaughter testified differently, stating that Warren "told me that no matter what my son drives or what anybody drives, you would still be 100 percent covered because insurance [from the Westfield policy] . . . follows the vehicle and if you give somebody permission to use the car for any purpose, it's covered."  (Id. at B229).

24

Importantly, however, the record clearly indicates that this disputed representation was made *after* the Westfield policy was purchased.   Lee Slaughter testified that he told Warren about his son turning sixteen

> Because I didn't really know what to do with the insurance . . . you know, and that's why I asked the question.   I wasn't sure whether just put the dealer tag on it or what to do. It sorta struck me as funny that why should I put a car in my name when <u>I've already got insurance with dealer tags</u>, and we even discussed it. If I remember right [Warren] asked, you know, like well, is [Paul] working for you?

(<u>Id.</u> at B228 (emphasis added).)   If Defendants/Third-Party Plaintiffs justifiably relied on a false representation in deciding to purchase the Westfield policy, the representation would necessarily had to have been made *before* the policy was purchased.   The record indicates that the Westfield policy was renewed for the period of June 4, 2005 through June 4, 2006 (<u>id.</u> at B26, 37-38), but that it had been in effect for approximately 10-15 years prior to the collision, <u>supra</u> p. 21.   Lee Slaughter made general statements in his deposition to the effect that Warren had "always told me insurance follows the car." (<u>E.g,</u> D.I. 49, at B222.)   However, Defendants/Third-Party Plaintiffs have not directed the Court's attention to any other evidence in the record- from Lee Slaughter's deposition or elsewhere- showing that representations about the Westfield policy covering Paul Slaughter were made *before* the Westfield policy was purchased. Accordingly, even viewing the evidence in the light most

favorable to Defendants/ Third-Party Plaintiffs, there are no genuine issues of material fact with regard to the negligent misrepresentation and equitable fraud claims, as alleged.

## V.   Conclusion

For the reasons discussed, Westfield's and Pfister's Motions For Summary Judgment will be granted.   Defendants' Motion For Summary Judgment will be denied.

An appropriate Order will be entered.